United States Court of Appeals,

Fifth Circuit.

No. 91–1282.

Carroll CHILDERS, Plaintiff–Appellant,

v.

PUMPING SYSTEMS, INC., et al., Defendants–Appellees.

Aug. 19, 1992.

Appeal from the United States District Court for the Northern District of Texas.

Before WILLIAMS, JOLLY, and HIGGINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Carroll Childers brought suit in Texas state court to recover stock held in escrow by Texas American Bank. His suit was based upon the claim that Pumping Systems, Inc. and Jerry Pettengill breached a previous settlement agreement. Pumping Systems, Inc. and Pettengill countersued seeking a declaratory judgment that they did not breach the agreement. The FDIC removed the case to federal district court when it became receiver for the insolvent Texas American Bank. The district court adopted the state court's holding that there was no breach but that Childers should receive damages because Pumping Systems, Inc. had underpaid royalties it owed Childers. Childers appeals the district court's ruling.

I. FACTS

In 1979, Carroll Childers sued Pumping Systems, Inc. ("PSI"), Jerry Pettengill, and Joseph Van Y in a dispute over ownership of PSI stock. The parties entered into a settlement consisting of, *inter alia,* a Royalty Compensation Agreement and a Collateral Pledge Agreement. The present case involves an alleged breach of the Royalty Compensation Agreement.

In accordance with the Royalty Compensation Agreement, PSI agreed to pay Childers quarterly royalty payments for five years. The agreement included a formula to determine the royalty

amount, and it provided Childers with the right to have an independent certified public accountant audit PSI's books to ensure PSI was making the proper royalty payments.

The Collateral Pledge Agreement required Texas American Bank–Dallas ("TAB") to hold PSI stock in escrow as additional security. The Collateral Pledge Agreement granted Childers the option to foreclose on the stock "[i]n the event of a material breach of the Royalty Compensation Agreement."

PSI missed a payment due under the Royalty Compensation Agreement on November 20, 1984. PSI did pay the next day. Childers maintains the one day delay in payment materially breaches the Royalty Compensation Agreement because time is of the essence of the agreement. Childers also claims PSI breached the agreement when it restructured the company in a way that reduced the royalty it paid to Childers.

On January 25, 1985, Childers initiated the present litigation against TAB in Texas state court to foreclose on the escrowed PSI stock. On February 18, 1986, PSI and Pettengill sued Childers in a separate state court proceeding seeking a declaratory judgment that PSI's one-day payment delay did not materially breach the Royalty Compensation Agreement. The two suits were consolidated.

In June 1986, the court ordered Arthur Young Co. ("AY") to audit PSI's books (the "Audit Order"). The order instructed AY to verify PSI's "gross sales and services revenues." When AY completed the audit report, PSI's counsel objected to the report incorporating information other than gross sales and services revenues. The state court conducted an *in camera* review of the report, and then it sealed a portion of the report.

After several hearings and motions for summary judgment by all parties, the state court entered a final judgment on April 21, 1987. The judgment granted Childers $6,831.53 in underpaid

royalties and returned the pledged stock to PSI and Pettengill. The issue of who would pay for the audit, however, remained unresolved.

On August 18, 1989, the FDIC, as receiver for the insolvent TAB, removed the case to the United States District Court for the Northern District of Texas. Both sides moved for summary judgment. PSI and Pettengill moved that Childers pay the cost of the audit, and Childers moved for a reversal of the state court judgment. The district court adopted the state court judgment and ruled that Childers must pay the full cost of the audit. Childers appeals. Subsequent to the filing of the appeal, the parties mutually agreed to dismiss all claims against TAB and FDIC–Receiver.

## II. BREACH OF THE ROYALTY COMPENSATION AGREEMENT

A. TIME OF THE ESSENCE:

The current litigation arose because Childers claims PSI materially breached the Royalty Compensation Agreement by paying the royalty one day late. In other words, Childers is claiming time is of the essence of the agreement. Under Texas law, time is not of the essence of a contract unless the contract explicitly makes it so or the contract is of such a nature or purpose that it indicates the parties' intention that they must perform the contract at or within the time specified. *Laredo Hides Co., Inc. v. H & H Meat Products Co., Inc.,* 513 S.W.2d 210, 216 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.); *Siderius, Inc. v. Wallace Co., Inc.,* 583 S.W.2d 852, 863 (Tex.Civ.App.—Tyler 1979, no writ).

The Royalty Compensation Agreement does not specify that time is of the essence. Although the agreement specifies the dates payments were due, the Texas courts hold that designation of a particular date for performance does not, of itself, indicate time is of the essence. *Seismic & Digital Concepts, Inc. v. Digital Resources Corp.,* 590 S.W.2d 718, 720 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ); *Builders Sands, Inc. v. Turtur,* 678 S.W.2d 115, 118 (Tex.App.—Houston [14th Dist.] 1984, no writ); *Argos Resources, Inc. v. May Petroleum, Inc.,* 693 S.W.2d 663, 664–65

(Tex.App.—Dallas 1985, writ ref'd n.r.e.).

The Royalty Compensation Agreement also is not a contract that, by its nature, mandates that time is of the essence. Texas courts, in contrast for example, have held time is of the essence in option contracts because the party is essentially buying time. *Smith v. Hues,* 540 S.W.2d 485, 488 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.); *Greenbaum v. Cortez,* 644 S.W.2d 510, 512 (Tex.App.—Corpus Christi 1982, writ dismissed). Similarly, time might be of the essence if PSI paid Childers in stock because the stock price would fluctuate over time. PSI's delivery of the stock on the date specified would, therefore, be critical. In the present case, however, PSI was to pay cash based upon its revenues. The value of the royalty did not fluctuate depending upon what day PSI paid it. We conclude, therefore, that time was not of the essence of the agreement because delay in payment did not significantly harm Childers. Consequently, the delay in payment did not materially breach the agreement.

B. RESTRUCTURING:

Childers further maintains PSI intentionally breached the Royalty Compensation Agreement when it restructured its business and "spun off" income to its sales representatives. Childers claims several employees became "area representatives." The customers then paid the representatives, instead of PSI, for service work. According to Childers, the effect of the reorganization was to reduce the royalties Childers received.

Although the deposition testimony of two witnesses raises doubts as to why PSI and Pettengill reorganized the company, Childers' claim nevertheless fails because the Royalty Compensation Agreement does not prohibit restructuring. Moreover, Texas law does not imply a covenant of good faith and fair dealing in every contract. *English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983); *Crowder v. Tri–C Resources, Inc.,* 821 S.W.2d 393, 398 (Tex.App.—Houston [1st Dist.] 1991, no writ); *Fireman's Fund Ins. Co. v. Murchison,* 937 F.2d 204, 208 (5th Cir.1991).

Texas law implies such a covenant only when a special relationship exists between the parties such as insurers and insured, principal and agent, joint venturers, and partners. *Cockrell v. Republic Mortgage Ins. Co.,* 817 S.W.2d 106, 116 (Tex.App.—Dallas 1991, no writ); *Manufacturers Hanover Trust Co. v. Kingston Investors Corp.,* 819 S.W.2d 607, 610 (Tex.App.—Houston [1st Dist.] 1991, no writ). The relationship between Childers and PSI and Pettengill does not qualify as a special relationship necessitating an implied covenant of good faith and fair dealing. PSI, therefore, did not breach the Royalty Compensation Agreement, either by its one day delay in payment or by its business restructuring.

## III. AMBIGUOUS CONTRACT

Childers also asserts that the Royalty Compensation Agreement is ambiguous as it pertains to royalty computation. We note that the ambiguity issue remains even though we hold PSI did not breach the agreement. With or without a breach, Childers possessed the right to audit PSI's books. The audit, as well as Childers' own expert, indicate the agreement might be ambiguous.

Whether the Royalty Compensation Agreement is ambiguous is a question of law for the court. If the agreement is worded so that this Court can ascertain a certain or definite meaning, it is not ambiguous. If the agreement, however, is reasonably susceptible to more than one interpretation, it is ambiguous. *D.E.W., Inc. v. Local 93, Laborers' International Union of North America,* 957 F.2d 196, 199 (5th Cir.1992); *R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518–19 (Tex.1980); *Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983). "A contract is not ambiguous merely because the parties disagree upon the correct interpretation or upon whether it is reasonably open to just one interpretation." *D.E.W.,* 957 F.2d at 199. If the agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a fact question for the jury. *Id.; Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987).

The disputed issue is whether the Royalty Compensation Agreement is ambiguous regarding

computation of the royalty payable to Childers. Paragraph 1 of the agreement states, "The company hereby promises to pay to Carroll E. Childers ... an amount equal to one and one-half percent (11/2%) of the Company's gross sales and service revenues ... computed and payable in the manner provided in this Agreement." Paragraph 2 then establishes a minimum payment.[1] Essentially, the agreement purports to do more than require that PSI will pay Childers a royalty of 11/2% of gross sales and service revenues since it also provides that if that amount is less than the minimum quarterly payment, then PSI instead must pay Childers the minimum quarterly payment.

A problem arises, however, because the agreement contains two separate provisions for calculating the quarterly payment, and the two provisions conflict. Paragraph 3 provides one royalty formula while Exhibit A provides another.

Paragraph 3 states:

3. *Computation of Royalty; Payment Schedule.* At the end of each of the twenty (20) quarters during which this Agreement is in effect, commencing with the quarter ending July 30, 1981, the following computation shall be made and certified by the chief executive or financial officer of the Company:

a. Compute aggregate gross sales and service revenues from May 1, 1981 through the end of the quarter then ended.

b. Multiply these aggregate revenues by one and one-half percent (11/2%) (the "Gross

---

[1]"The company promises to pay to Childers, as an advance against first royalties due, and as the minimum guaranteed sum to be received by Childers as royalty over the term of this Agreement, the sum of Two Hundred Forty–Seven Thousand Six Hundred Dollars ($247,600), payable in installments as follows:

a. Upon execution and delivery of this Agreement, a payment of Twenty–Seven Thousand Six Hundred Dollars (27,600),

b. Eight monthly payments of Ten Thousand Dollars ($10,000) each, commencing October 1, 1980, and continuing on the same day of each succeeding month through May 1, 1981.

c. Twenty quarterly payments of Seven Thousand Dollars ($7000) each, commencing August 20, 1981) and continuing on the same day of each third month thereafter until fully paid.

Aggregate Royalty Earned").

c. Compute the "Aggregate Minimum Royalty Paid" by adding all minimum payments then actually having been paid under Paragraph 2 of this Agreement from the execution of this Agreement through the quarter then ended.

d. Subtract the Aggregate Minimum Royalty Paid from the Gross Aggregate Royalty Earned. If the result is a positive amount, that amount shall be remitted, on the date of and in addition to, the next maturing quarterly payment. If the amount is negative, only the next maturing monthly or quarterly minimum payment shall be due.

The parties apparently attempted to reiterate the payment schedule in Exhibit A of the Royalty Compensation Agreement. Exhibit A is expressly made part of the Royalty Compensation Agreement in Paragraph 10 which states, "Exhibit "A' to this Agreement contains a schedule of payments to be made under this Agreement." The problem is that distinct differences pervade Paragraph 3 and Exhibit A.[2]

The first distinction concerns the time span of the $7000 minimum quarterly payments. In calculating a given quarter's aggregate minimum payment, Exhibit A includes the next quarter's $7000 minimum payment. For example, in calculating the aggregate minimum payment for the quarter ending January 31, 1983, Exhibit A incorporates the $7000 minimum payment due on February 20, 1983. It is apparent the quarterly royalty computed in accordance with Exhibit A includes the next quarter's minimum payment because the $7000 minimum payment due on February 20, 1983 is added to the "Total Minimum Paid & Due to Date," and the total minimum paid is subtracted from 11/2% of all sales through the end of January 31, 1983.

The wording of paragraphs 2 and 3, however, suggests that the subsequent quarter's minimum payment should not be calculated in the current quarter's Aggregate Minimum Royalty Paid. Paragraph 2(c) states PSI will make "[t]wenty quarterly payments of Seven Thousand Dollars ($7000) each, *commencing August 20, 1981* ..." Paragraph 3 states "At the *end* of each of the twenty (20) quarters ... [c]ompute the "Aggregate Minimum Royalty Paid' by adding all minimum payments

_____

[2]The text of Exhibit A is appended as the Appendix of this opinion.

then *actually having been paid* under Paragraph 2 of this Agreement from the execution of this Agreement through the quarter then ended." The distinction between the two formulas produces an aggregate minimum payment under Exhibit A, which is, at any given time, $7000 greater than the Aggregate Minimum Royalty Paid under Paragraph 3.

A second, and more crucial, distinction between Paragraph 3 and Exhibit A involves the final computation of the royalty PSI owes Childers. Exhibit A requires PSI to subtract the aggregate minimum payments from 11/2% of all sales. If the difference is negative, then PSI is to pay the minimum quarterly amount. If the difference is positive, however, PSI is to pay the difference. Paragraph 3, on the other hand, yields a different result. Paragraph 3 also requires PSI to subtract the Aggregate Minimum Royalty Paid from the Gross Aggregate Royalty Earned, and, again, if the result is negative, then PSI must pay the minimum quarterly amount. If the difference is positive, however, PSI must pay the difference "*in addition to* [ ] the next maturing quarterly payment." Consequently, if the difference between the Gross Aggregate Royalty Earned and the Aggregate Minimum Royalty Paid is positive, Paragraph 3 mandates a greater payment than Exhibit A because Paragraph 3 calculates the royalty and then adds the minimum quarterly payment to it. Finally, the method for calculating royalties provided in either paragraph 3 or Exhibit A is arguably different than the method used by PSI. Whereas PSI's method would deduct all royalties previously paid from gross aggregate royalties, paragraph 3 and Exhibit A can be interpreted as saying that only the prior *minimum* payments due should be subtracted. Both methods would produce significantly higher amounts of royalties due than under PSI's method.

The parties erroneously drafted separate and conflicting formulas for calculating the royalty PSI owed Childers. PSI arguably followed neither of these methods. Because the contract is ambiguous on its face, the trier of fact must determine the parties' intent. *Reilly,* 727 S.W.2d at 529 ("When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument is a question of fact for the jury"); *Gaulden v. Johnson,*

801 S.W.2d 561, 564 (Tex.App.—Dallas 1990, writ denied) ("Once the document is found to be ambiguous, the determination of the parties' intent through extrinsic evidence is a question of fact"). Accordingly, we reverse the summary judgment and remand the case to the district court to determine the parties' intent with respect to calculation of the royalty.[3]

## IV. PAYMENT OF THE AUDIT

In addition to permitting a certified accountant to audit PSI's books, Paragraph 6 of the Royalty Compensation Agreement states:

> Childers shall bear the expense of such audit or review, unless such independent certified public accountant agrees that the Royalty Earned during the quarter or quarters for which revenues have been reviewed, have been understated by more than 3%, in which event [PSI] shall pay for the expense of such review.

The district court ruled Childers must pay for the AY audit, and Childers appeals.

The AY audit analyzed PSI's royalty payments for the five-year period from May 1981 through April 1986. We find it impossible to determine how much PSI understated royalties because we hold the contract is ambiguous and the contract interpretation of the method of calculation must be determined before the district court can decide the percentage of understatement to assess the costs of audit. Upon remand and determination of the percentage of understatement, the district court can then decide who bears the cost of the audit.

A subordinate issue as to payment of the audit also is raised by Childers. The Royalty Compensation Agreement states that PSI must pay for the audit only if PSI has understated the royalties by more than three percent "during the quarter or quarters for which revenues have been reviewed." In the present case, Childers requested an audit of a five-year period. Childers asserts

---

[3]In determining the parties intent, the district court should bear in mind that Childers never objected to PSI's method of computation prior to this lawsuit. Childers' acquiescence is not a waiver of its complaint, but it is at least some evidence of the fact that the royalty was calculated in accordance with the parties' intent.

that if the audit determines that PSI understated royalties by more than three percent during any quarter, PSI must pay for the audit.  Childers, however, requested a five-year audit, and if over that five-year period, PSI understated royalties by less than three percent, then it is irrelevant that for any quarter or quarters PSI understated royalties by more than three percent.  Had Childers requested an audit of a time period in which PSI had understated royalties by more than three percent for that entire time period, then the agreement would require PSI to pay for the audit.  Further, the Royalty Compensation Agreement makes no provision for prorating the audit cost so that PSI pays for the proportion of the audit representing the quarters in which it understated royalties by more than three percent.  Thus, when the district court determines the amount of the underpayment of royalties based upon the proper method of calculating royalties, it must assess the cost of the audit to Childers if PSI understated royalties by less than three percent for the entire period for which Childers requested the audit.

## V. DUE PROCESS

When AY completed its audit report, it presented the report to PSI in accordance with the Audit Order.  PSI objected to the report, claiming it contained information outside the scope required by the Royalty Compensation Agreement and the Audit Order.  In accordance with the Audit Order, AY presented the report to the court for an *in camera* review.  PSI sent a letter to the court requesting that the court excise certain information from the report.  The state district court reviewed the report and determined the report did exceed the Audit Order's requirements.  Thus, the court released Schedule 2 and Appendix D of the report and sealed the rest of the report.

Childers claims the court violated his due process rights.  He maintains PSI did not send him a copy of the letter requesting deletion of part of the report, nor did the court grant him a hearing on the issue of sealing all but three pages of the report.

In reviewing a ruling to seal information after an *in camera* review, this Court should reverse

only if the trial court has abused its discretion. *Sanders v. Shell Oil Co.,* 678 F.2d 614, 618 (5th Cir.1982); *Meyer Goldberg Inc., of Lorain v. Fisher Foods, Inc.,* 823 F.2d 159, 161 (6th Cir.1987). We first note that the state district court followed the procedures it stated it would follow in its June 1986 Audit Order. Second, contrary to Childers' assertions, he had an opportunity to object. On October 10, 1986, the state court held a conference call on the audit report's contents. Childers' attorney participated in the call. Moreover, on January 8, 1987, the state court held a hearing at which Childers argued he was entitled to the complete audit. The court, therefore, did not deny Childers due process because it provided him an opportunity to present his arguments.

Furthermore, the state court judge did not abuse his discretion in sealing some of the report. This court has conducted an *in camera* review of the AY audit report, and we affirm the state court's ruling. The Royalty Compensation Agreement permits an audit "for the limited purpose of verifying [PSI's] gross sales and service revenues." The Audit Order similarly limited the scope of the audit to verification of gross sales and service revenues. The AY report, however, exceeded these boundaries and included information concerning royalty computation. This information went beyond the scope of both the agreement and the court's mandate. PSI agreed only to open its books for a limited purpose, and Childers is not entitled to any information obtained in the report which goes beyond the agreement and the Audit Order. The state court, therefore, did not abuse its discretion.

## VI. REMAINING ISSUES

Childers presents several procedural issues, which we summarily resolve. Childers objects to the trial court's releasing the stock in question from the registry of the court. TAB had interpleaded the stock into the court's registry, and Childers requests that we order PSI and Pettengill to return it. We decline to issue such an order. TAB originally deposited the stock in the court's registry so that the court could tender it to Childers in accordance with the Collateral Pledge Agreement if PSI had breached the Royalty Compensation Agreement. As we discussed above, PSI never breached the Royalty Compensation Agreement. Although PSI may have underpaid the

royalties it owed, we need not require it to return the stock to the court's registry.

All of the remaining issues are properly reviewed under the abuse of discretion standard. *Coughlin v. Lee,* 946 F.2d 1152, 1158 (5th Cir.1991) (discovery requests); *Zenith Radio Corp. v. Clark,* 665 S.W.2d 804, 806 (Tex.App.—Austin 1983, no writ) (discovery requests); *Smith–Weik Mach. Corp. v. Murdock Mach. Eng'g Co.,* 423 F.2d 842, 844 (5th Cir.1970) (motions for continuance); *State v. Crank,* 666 S.W.2d 91, 94 (Tex.), *cert. denied,* 469 U.S. 833, 105 S.Ct. 124, 83 L.Ed.2d 66 (1984) (motions for continuance); *Calcasieu Marine Nat'l Bank v. Grant,* 943 F.2d 1453, 1464 (5th Cir.1991) (motions for new trial); *Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983) (motions for new trial); *Nevels v. Ford Motor Co.,* 439 F.2d 251, 257 (5th Cir.1971) (striking amended petitions); *Plata v. Guzman,* 571 S.W.2d 408, 411 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.) (striking amended petitions).

Childers claims the state court erred when it denied his discovery requests. Childers requested documents evidencing both PSI's royalty payments and PSI's financial relationship with TAB. PSI objected to the request, claiming either they had already produced the requested documents or the documents were irrelevant. Childers maintains PSI should have produced the documents for an *in camera* inspection and offered evidence to establish their claim of privilege. PSI, however, did not claim a privilege, and, therefore, it was not required to produce the documents or evidence establishing the privilege. Tex.R.Civ.P.R. 166b(4) (West 1992). We find the trial judge did not abuse his discretion, and we affirm the ruling denying discovery.

Childers also asserts the trial court erred when it denied his motion for a continuance. On January 5, 1987, three days before the hearing on PSI's motion for summary judgment, Childers moved for a continuance. Childers claims he was unable to prepare an adequate response to the motion for summary judgment because he did not obtain the released three pages of the AY report until the day of the hearing. Although it would have been preferable for Childers to receive a copy

of the report prior to the trial, he did have an opportunity at least to view the relevant three pages. Thus, the state court did not abuse its discretion. In any event, the court held a subsequent hearing on February 23, 1987, at which time the court provided Childers with an opportunity to present his arguments subsequent to acquiring the report.

Childers further maintains the trial court erred when it denied his motion for new trial. "It is incumbent upon a party who seeks a new trial on the ground of newly discovered evidence to satisfy the court first, that the evidence has come to his knowledge since the trial; second, that it was not owing to the want of due diligence that it did not come sooner; third, that it is not cumulative; fourth, that it is so material that it would probably produce a different result if a new trial were granted." *Jackson,* 660 S.W.2d at 809. Childers' attorney discovered parts of the AY report in the court's files on April 15, 1987, and Childers asserts the new evidence fulfills the *Jackson* requirements.

The trial judge in the present case did not abuse his discretion. On January 8, 1987, the trial judge informed Childers in open court of the report's existence, and instructed him that he could obtain a copy of the portion that had not been sealed. Thus, Childers had access to the requisite portion of the report. He did not have access to the sealed portion of the report, but we have already affirmed the propriety of the court's decision to seal most of the report as not within the proper scope of the audit provided for in the contract.

Childers next asserts the trial court erred when it struck his amended petition. Childers filed his First Amended Original Petition on January 5, 1987, three days prior to the hearing. State law, however, dictates that the parties cannot file amendments within seven days of the trial date unless the judge grants permission and the opposing party is not surprised.[4] Childers argues that although

_____

[4]"Parties may amend their pleadings, respond to pleadings on file of other parties, file suggestions of death and make representative parties, and file such other pleas as they may desire by filing such pleas with the clerk at such time as not to operate as a surprise to the opposite

he should have filed the amendment by January 1, 1987, the courthouse was closed for the holidays January 1 through January 4. Moreover, Childers claims PSI and Pettengill could not have been surprised regarding the unpaid royalties claim because they possessed AY's audit report, which reflected the underpayment of royalties.

The trial judge struck the amendment, not because of surprise to PSI and Pettengill, but because Childers had failed to obtain leave of the court as required by the rules. The trial court did not abuse its discretion. Moreover, Childers filed an amended pleading setting out the same allegations as the struck pleading, and the court considered this subsequent pleading at a later hearing. The striking of the earlier amendment, therefore, did not prejudice Childers.

## VII. CONCLUSION

We affirm the district court's holding to the extent that it held there was no material breach of the Royalty Compensation Agreement. We also find no error in the court's procedural treatment of the case. The district court erred, however, when it made a finding on the merits that the royalty had been understated. We find that the Royalty Compensation Agreement is ambiguous with respect to calculation of royalties owed by PSI to Childers. We therefore reverse the court's ruling on royalties and remand the case for the court to determine how the parties intended to calculate the royalty, and for such further proceedings as are required.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

APPENDIX

CONTRACT EXHIBIT "A"

---

party; provided that any pleadings, responses or pleas offered for filing within seven days of the date of trial or thereafter, or after such time as may be ordered by the judge under Rule 166, shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposing party."
Tex.R.Civ.P.R. 63 (West 1992).

PAYMENT SCHEDULE

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Date 5/1/81 | MinimumPayment through quarter last Ended | | Total MinimumPaid & Due toDate (3) minus (2)* | 11/2% of all sales from |
| Initial | $ 27,600 | | $ 27,600 | |
| Oct. 1, 1980 | 10,000 | | 37,600 | |
| Nov. 1, 1980 | 10,000 | | 47,600 | |
| Dec. 1, 1980 | 10,000 | | 57,600 | |
| Jan. 1, 1981 | 10,000 | | 67,600 | |
| Feb. 1, 1981 | 10,000 | | 77,600 | |
| March 1, 1981 | | 10,000 | 87,600 | |
| April 1, 1981 | 10,000 | | 97,600 | |
| May 1, 1981 | 10,000 | | 107,600 | |
| August 20, 1981 | | 7,000 | 114,600 | _____ |
| Nov. 20, 1981 | | 7,000 | 121,600 | _____ |
| Feb. 20, 1982 | 7,000 | | 128,600 | _____ |
| May 20, 1982 | 7,000 | | 135,600 | _____ |
| August 20, 1982 | | 7,000 | 142,600 | _____ |
| Nov. 20, 1982 | | 7,000 | 149,600 | _____ |
| Feb. 20, 1983 | 7,000 | | 156,600 | _____ |
| May 20, 1983 | 7,000 | | 163,600 | _____ |
| Aug. 20, 1983 | 7,000 | | 170,600 | _____ |
| Nov. 20, 1983 | | 7,000 | 177,600 | _____ |

Feb. 20, 1984  7,000  184,600  _____

May 20, 1984  7,000  191,600  _____

Aug. 20, 1984 7,000  198,600  _____

Nov. 20, 1984        7,000  205,600  _____

Feb. 20, 1985  7,000  212,600  _____

May 20, 1985  7,000  219,600  _____

Aug. 20, 1985 7,000  226,600  _____

Nov. 20, 1985        7,000  233,600  _____

Feb. 20, 1986  7,000  240,600  _____

May 20, 1986  7,000  247,600  _____

_____

Total   $247,600      $257,600

[*] If this amount is negative, pay minimum amount (1).  If positive, pay this amount.